UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLAMETTE GREEN INNOVATION
CENTER, LLC,

          Plaintiff,

    v.

QUARTIS CAPITAL PARTNERS, et al.,

          Defendants.

Case No.  13-cv-00848-JCS

**REPORT AND RECOMMENDATION
REGARDING PLAINTIFF'S MOTION
FOR DEFAULT JUDGMENT**

Re: Dkt. No. 33

## I.    INTRODUCTION

Willamette Green Innovation Center, LLC ("Plaintiff") filed this action against Quartis Capital Partners ("Quartis"), Quartis' general manager Harry P.W. de Gooyer ("de Gooyer"), and the Dr. A. Chabi Family Trust (Labuan) ("Trust"), alleging breach of contract, money had and received, violation of section 10146 of the California Business and Professions Code, and fraud. *See* Compl. ¶¶ 16–39. Quartis' principal place of business and de Gooyer's place of citizenship is the Netherlands. *See id.* ¶¶ 2, 4. The Trust's principal place of business is Malaysia. *See id.* ¶ 3.

Plaintiff has voluntarily dismissed the Trust from this action without prejudice. *See* Dkt. No. 21. Quartis and de Gooyer (together, "Defendants") were properly served, but they failed to timely appear or otherwise respond. *See* Decl. of Charles Markley in Supp. of Pl.'s Mot. for Default J. ¶ 3 ("Markley Decl."). Accordingly, the Clerk entered Defendants' default on October 8, 2013. *See* Dkt. No. 37.

Presently before the Court is Plaintiff's Motion for Default Judgment ("Motion"). A hearing on the Motion was held on November 22, 2013. At the hearing, Plaintiff informed the Court that Defendants had recently sent Plaintiff papers opposing the Motion. Defendants, appearing *pro se*, filed those opposing papers with the Court on November 25, 2013. *See* Defs.'

United States District Court
Northern District of California

Opp'n to Mot. ("Opp'n"). The Court gave Plaintiff leave to file a reply, which was filed on

December 5, 2013. *See* Pl.'s Reply to Opp'n ("Reply"). For the reasons explained below, the

Court recommends that the Motion be GRANTED IN PART AND DENIED IN PART.

## II.    FACTUAL BACKGROUND

The following facts are taken from Plaintiff's complaint and declarations filed by Plaintiff,

as well as papers filed by Defendants.[1]

In early 2012, Defendants—acting on behalf of the Trust, a prospective lender—held

discussions with Plaintiff regarding a prospective loan for financing Plaintiff's construction of a

power plant with adjacent greenhouses. Decl. of Gregory Wallace in Supp. of Pl.'s Mot. for

Default J. ¶¶ 2, 3 ("Wallace Decl."). Plaintiff and Defendants discussed a proposal involving a

loan of $60 million from the Trust to Plaintiff, secured by a senior position on Plaintiff's real

property, personalty, and intangible property. *See id.* ¶ 2.

On March 21, 2012, Quartis, acting on behalf of the Trust, sent a Term Sheet to Plaintiff

providing terms of the prospective loan. *Id.* ¶ 4. The Term Sheet stated that closing was subject to

a due diligence evaluation that was satisfactory to the Trust. *Id.* Ex. A at 2 ("Term Sheet").

Plaintiff understood that the due diligence evaluation would be undertaken by Quartis, and that it

would evaluate Plaintiff's structure, finances, and business plan in order "to assess [Plaintiff's]

suitability as borrower of the [T]rust's funds." *See id.*; Wallace Decl. ¶¶ 5, 6. The Term Sheet also

stated that Plaintiff was required to make a "deposit" of €100,000 "towards its share" of the due

diligence expenses. Term Sheet at 7.

On April 26, 2012, de Gooyer, writing on behalf of the Trust, sent an e-mail to Plaintiff

stating that the due diligence evaluation was anticipated to take approximately four to six weeks.

*See* Wallace Decl. ¶ 7. Plaintiff responded that it would transfer the €100,000 deposit to Quartis

after a satisfactory meeting between Plaintiff and de Gooyer. *Id.* ¶ 8. A copy of de Gooyer's e-

mail, including a hand-written note reflecting Plaintiff's condition regarding a satisfactory

---

[1] The Court notes that as to Quartis, the Opposition was improperly filed because a corporation or other business entity must be represented by an attorney. *See* Civ. L.R. 3-9(b) ("A corporation, unincorporated association, partnership or other such entity may appear only through a member of the bar of this Court."). Nonetheless, the Court has considered the Opposition's assertions and arguments in deciding the instant Motion.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    meeting, was later incorporated into the Term Sheet as an addendum. *See id.* ¶ 7; Wallace Decl.

2    Ex. B ("Addendum to Term Sheet"). Defendants assert that they received an "accepted and

3    executed version of the Term Sheet" on May 1, 2012.[2] *See* Opp'n at 3.

4          On May 24, 2012, Plaintiff met with de Gooyer in San Francisco. Wallace Decl. ¶ 9.

5    During the meeting, de Gooyer represented to Plaintiff that the Trust "was not concerned about the

6    amount of equity in [P]laintiff's capital structure and that a response to the due diligence would be

7    forthcoming in four to eight weeks." *See* Compl. ¶ 32. Defendants assert that the parties

8    "discussed many times that the refundable at closing due diligence deposit was a fixed a capped

9    [sic] 'price.'" *See* Opp'n at 6.

10          At some point after the San Francisco meeting, Plaintiff agreed to make the deposit. *See*

11    Wallace Decl. ¶ 10. On June 11, 2012, Plaintiff wired €100,000 to Quartis. *Id.* Over the next five

12    months, Defendants did not ask Plaintiff any substantive questions, did not request any

13    documents, and did not conduct any interviews of personnel, despite Plaintiff's repeated offers to

14    provide information. *Id.* ¶¶ 12, 14. Nor did Defendants send Plaintiff any written reports,

15    proposals, or additional term sheets regarding the proposed loan. *See id.* ¶ 13. Defendants assert

16    that because "the quality and quantity of information provided was of a high standard there was

17    . . . no need for follow-up meetings or meetings" with Plaintiff's employees. *See* Opp'n at 4.

18          Defendants assert that Quartis spent "a lot of time and energy in conducting the Due

19    Diligence," but "the family members of the Trust during their Investment Committee meeting

20    could not reach an agreement." *See id.* Defendants assert that the Trust had concerns "about the

21    financial impact in the event there would be 1–2 years negative results [sic] (negative cash-flow),"

22    and "the lack of Equity in the project." *See id.* In late November 2012, de Gooyer informed

23    Plaintiff that the Trust would not fund the project. *See id.* (asserting that de Gooyer informed

24    Plaintiff on November 23, 2012); Wallace Decl. ¶ 11 (asserting that de Gooyer informed Plaintiff

25    on November 27, 2012).

26

27    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28    [2] Defendants have not submitted a copy of the executed Term Sheet with their Opposition. The Term Sheet, as submitted by Plaintiff, did not include any signature blocks or blanks for initials.

Plaintiff never received any accounting for any due diligence activities or other expenses with regard to the €100,000 deposit. Wallace Decl. ¶ 15. Defendants do not appear to dispute the lack of accounting. *See generally* Opp'n.

Defendants assert that Quartis "offered to invest extra time in finding an Equity partner" and it "talked to banks and private investors in December 2012 and January 2013 but the result was, unfortunately, negative." *See id.* at 4. On or about February 8, 2013, Plaintiff demanded that Defendant return the deposit, but Defendant refused. *See* Compl. ¶ 25. Plaintiff filed the instant suit on February 25, 2013. *See* Compl. at 1.

**III.    ANALYSIS**

**A.    Standard for Entering Default Judgment**

Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, a court may enter a default judgment where the clerk, under Rule 55(a), has previously entered the party's default based upon failure to plead or otherwise defend the action. Fed. R. Civ. P. 55(b). Here, the Clerk entered Defendants' default on October 8, 2013. Dkt. No. 37.

A defendant's default, however, does not automatically entitle the plaintiff to a court-ordered default judgment. *Draper v. Coombs*, 792 F.2d 915, 924–25 (9th Cir. 1986). "Granting or denying a motion for default judgment is a matter within the court's discretion." *Landstar Ranger, Inc. v. Parth Enters., Inc.*, CV 09-01426 MMM (AJWx), 2010 WL 2889490, at *2 (C.D. Cal. Jul. 19, 2010) (quoting *Elektra Entm't Grp. Inc. v. Bryant*, CV 03-6381GAF(JTLX), 2004 WL 783123, at *1 (C.D. Cal. Feb. 13, 2004)).

As an initial matter, a court must address the adequacy of service of process on the defendant against whom default judgment is sought. *Penpower Tech. Ltd. v. S.P.C. Tech.*, No. 07-3621 SC, 2008 WL 2468486, at *2 (N.D. Cal. June 17, 2008) (citing *Bd. of Trs. of the N. Cal. Sheet Metal Workers v. Peters*, C-00-0395 VRW, 2000 U.S. Dist. LEXIS 19065, at *2 (N.D. Cal. Jan. 2, 2001)).

After a court determines that service is proper, it then considers the following factors in deciding whether to enter a default judgment:

(1) the possibility of prejudice to plaintiff; (2) the merits of plaintiff's substantive claim;

4

(3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning the material facts; (6) whether defendant's default was the product of excusable neglect; and (7) the strong public policy favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

In considering the plaintiffs' substantive claims and the sufficiency of the complaint, the factual allegations, except those concerning damages, are deemed to have been admitted by the non-responding party. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). This approach is consistent with the Federal Rules of Civil Procedure: "An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P. 8(b)(6). "However, 'a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.'" *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

**B.      Service**

Plaintiff contends that it properly served Defendants via Federal Express ("FedEx") in May 2013. To determine whether service was proper, the Court must address whether FedEx, a private courier, is a "postal channel[]" under Article 10(a) of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention").

**1.      Background Law**

An individual or a business entity may be served in a foreign country "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the [Hague Convention]." Fed. R. Civ. P. 4(f)(1), 4(h)(2). Article 10(a) of the Hague Convention provides that so long as the foreign country "does not object, the [Hague] Convention shall not interfere with . . . the freedom to send judicial documents, by postal channels, directly to persons abroad."

The Netherlands is a party to the Hague Convention, and it has not objected to sending judicial documents by "postal channels." *See In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 283 (Bankr. S.D.N.Y. 2013) (citing *Tinsley v. ING Grp.*, No. Civ.A. 05–808–KAJ, 2006 WL 533375, at *1 (D. Del. Mar. 3, 2006)); U.S. Dep't of State, Legal Considerations, International Judicial

United States District Court
Northern District of California

1    Assistance, Netherlands, http://travel.state.gov/content/travel/english/legal-

2    considerations/judicial/country/netherlands.html (last visited January 21, 2014). Thus, pursuant to

3    Rule 4(f)(1), 4(h)(2), and the Hague Convention, it is proper to serve individuals and business

4    entities in the Netherlands by "postal channels." *See Hawker*, 486 B.R. at 283.

5        The question of whether a private courier, such as FedEx, qualifies as a "postal channel"

6    has not been directly addressed by the Ninth Circuit. *See Intercontinental Indus. Corp. v. Luo*, CV

7    10-4174-JST EX, 2011 WL 221880, at *2–*3 (C.D. Cal. Jan. 20, 2011). *Cf. Magnuson v. Video*

8    *Yesteryear*, 85 F.3d 1424, 1431 (9th Cir. 1996) (noting in passing that FedEx is not "mail" under

9    Fed. R. Civ. P. 4). Nor is the term "postal channels" defined by Article 10 of the Hague

10   Convention. *See Luo*, 2011 WL 221880, at *2; *Hawker*, 486 B.R. at 284. However, the

11   intergovernmental organization that acts as the Hague Convention's secretariat has expressed a

12   favorable view of private couriers:

> private courier services offer the same security as domestic postal services, while usually
> being faster. In addition, pursuant to the wave of privatization in the postal sector, the
> distinction between public and private services has tended to blur. It is difficult to see,
> therefore, what would prevent a private courier service from being treated as a postal
> channel within the meaning of the [Hague] Convention.

16   *Luo*, 2011 WL 221880, at *2 (quoting Practical Handbook on the Operation of the Hague

17   Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents

18   in Civil or Commercial Matters 70 (3d ed. 2006)). *See also* 1 Litigation of Int'l Disputes in U.S.

19   Courts § 2:13 ("As a practical matter, due to the comparative efficiencies and practicalities of

20   employing international courier services, mail has come to be interpreted as including . . . private

21   services . . . .") (citation omitted).

22       In line with this reasoning, several courts have held or noted that private couriers fall

23   within the definition of "postal channels" under the Hague Convention. *See, e.g.*, *Hawker*, 486

24   B.R. at 284 (FedEx constitutes "postal channel" and thus service of defendant in the Netherlands

25   by FedEx was proper); *Power Integrations, Inc. v. Sys. Gen. Corp.*, C 04-02581 JSW, 2004 WL

26   2806168, at *2 (N.D. Cal. Dec. 7, 2004) (noting that court in *R. Griggs Grp. Ltd. v. Filanto Spa*,

27   920 F. Supp. 1100 (D. Nev. 1996) implicitly concluded that FedEx was a "postal channel" for

28   purposes of analyzing sufficiency of service under Hague Convention); *Luo*, 2011 WL 221880, at

United States District Court
Northern District of California

*3 (citing *Griggs*, 920 F. Supp. 1100; noting that court in *Casio Computer Co., Ltd. v. Sayo*, No. 98CV3772, 2000 WL 1877516, at *28 (S.D.N.Y. Oct. 13, 2000) recognized delivery by "overnight courier" as service by "postal channels").

Treating private couriers as within the definition of "postal channels" is in accord with the case law interpreting other rules regarding international service. For example, courts have found that delivery by private courier can constitute service by "mail" under Rule 4(f)(2)(C)(ii), which governs service in countries where there is no "internationally agreed means," *e.g.*, non-Hague Convention countries. Rule 4(f)(2)(C)(ii) permits service by "any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served," so long as it is "reasonably calculated to give notice" and not "prohibited by the foreign country's law." *See Power Integrations*, 2004 WL 2806168, at *2 (finding service by FedEx proper under Fed. R. Civ. P. 4(f)(2)(C)(ii)); *TracFone Wireless, Inc. v. Bequator Corp., Ltd.*, 717 F. Supp. 2d 1307, 1310 (S.D. Fla. 2010) (same); *Dee-K Enterprises Inc. v. Heveafil Sdn. Bhd.*, 174 F.R.D. 376, 379 (E.D. Va. 1997) (finding service by DHL proper under Fed. R. Civ. P. 4(f)(2)(C)(ii)).

Similarly, courts have authorized delivery by private courier as an acceptable method of service under Rule 4(f)(3), which allows for service "by other means not prohibited by international agreement as may be directed by the court." *See, e.g.*, *Mainstream Media, EC v. Riven*, C 08-3623 PJH, 2009 WL 2157641 (N.D. Cal. July 17, 2009) (noting that it had previously and properly directed service by FedEx); *Ehrenfeld v. Salim a Bin Mahfouz*, 04 CIV. 9641 (RCC), 2005 WL 696769 (S.D.N.Y. Mar. 23, 2005) (authorizing service upon certain parties by FedEx).

Having considered the legal authority and commentary on the issue, the Court concludes that private couriers, such as FedEx, come within the meaning of "postal channels" under the Hague Convention.

### 2.     Discussion

Here, the Clerk sent the summonses and complaints to Defendants' place of business via FedEx on or about May 6, 2013. *See* Decl. of Sherri Martinelli in Supp. of Pl.'s Resp. to Order to Show Cause ¶ 4 ("Martinelli Decl."), Exs. A (letter to Clerk requesting delivery of documents to Defendants by FedEx), B (copies of shipping labels retained by Plaintiff after sending originals to

Clerk for delivery to Defendants) (Dkt. Nos. 15, 15-1, 15-2). FedEx confirmation slips show that the materials were delivered on May 8, 2013 and were signed for by "D.E GOOYER." *See id.* Ex. C (Dkt. No. 15-3). This demonstrates that Defendants signed for and received the summonses and complaints. Thus, in this case, Plaintiff has complied with the requirements for service contained in Rule 4(f)(1), 4(h)(2), and the Hague Convention.

Defendants argue that service was improper because Quartis moved to a new address in September 2013. *See* Opp'n at 2. The Court rejects this argument because the FedEx delivery and the signature occurred in May 2013, several months before this move. Defendants also assert that they did not receive the summonses and complaints, arguing that perhaps someone else in the office building signed for the documents. *See id.* However, they have not provided any evidence to contradict the evidence that de Gooyer himself received the documents and signed for them on May 8, 2013, nor have they challenged the authenticity of this evidence.

Defendants also assert that "[o]ne of [their] partners in the USA" informed them of information about this lawsuit on the internet, and that they "studied" it but concluded with the "impression . . . that the Summons and Complaint were filed by not commenced." *See* Opp'n at 3. To the extent that Defendants intend to argue that they were led to believe that the suit had not actually been filed against them, the Court rejects this argument because it has not been adequately articulated, nor is it supported by evidence. Furthermore, Plaintiff's counsel sent an e-mail to de Gooyer on May 15, 2013 regarding this lawsuit, and Defendants have not denied receiving the e-mail, nor have they explained why they ignored it. *See* Decl. of Charles Markley in Supp. of Pl.'s Resp. to Order to Show Cause ("Markley OSC Decl."), Ex. A (e-mail from Plaintiff's counsel to de Gooyer urging response in this action) (Dkt. No. 14-1).

Defendants also argue that service was improper as to Quartis because Quartis was sued as limited liability partnership but it is actually a limited liability company. *See id.* at 2. The Court rejects this argument because misidentifying the entity type is not fatal to service. *See, e.g.*, *Carter v. City of Thibodaux Police Dep't ex rel. City of Thibodaux*, CIV.A. 13-105, 2013 WL 5673575, at *2 (E.D. La. Oct. 15, 2013) (quoting 5A Wright & Miller, Fed. Practice and Procedure § 1321, at 388–93 (3d ed. 2012)) ("A very common defect in the caption is a misnomer regarding a party . . .

1   or the identification of something that is not a legal entity. If the body of the complaint correctly

2   identifies the party being sued or if the proper person has actually been served with the summons

3   and the complaint, federal courts generally will allow amendment under Rule 15 to correct

4   technical defects in the caption when that is thought necessary."). Here, the record shows that

5   Quartis was properly served with the summons and the complaint. *See* Martinelli Decl. Ex. C. It is

6   also clear from Defendants' substantive arguments that Quartis is a proper defendant for Plaintiff's

7   suit.[3]

8          Accordingly, service on Defendants was proper.

9   **C.**   ***Eitel* Factors**

10         **1.**   **Possibility of prejudice to plaintiff**

11         The first *Eitel* factor considers whether the plaintiff will suffer prejudice if a default

12   judgment is not entered. *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1054 (N.D.

13   Cal. 2010). Here, Plaintiff would suffer prejudice if a default judgment is not entered because it

14   would be without another course of action to seek a recovery. Denying a plaintiff a means of

15   recourse is by itself sufficient to meet the burden posed by this factor. *See Moore v. Ruiz*, 1:11-

16   CV-2159 LJO-GSA, 2012 WL 3778874, at *2 (E.D. Cal. Aug. 31, 2012) (citing *Phillip Morris,*

17   *USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 499 (C.D. Cal. 2003)). In this case, the

18   prejudice is evident from an additional fact before the Court: while Defendants deny liability, they

19   have not appeared to defend the action by, for example, retaining an attorney (as Quartis, a

20   business entity, must), or by moving to set aside the default entered against them. Nor have they

21   given any indication that they intend to so. Thus, this factor weighs in favor of granting in default

22   judgment.

23         **2.**   **Merits of plaintiff's claims and sufficiency of complaint**

24         The second and third *Eitel* factors weigh the substantive merit of the plaintiff's claims and

25   the sufficiency of the pleadings to support those claims. Here, Defendants did not timely file an

---

[3] Defendants also make arguments regarding service on the Trust. However, these arguments are irrelevant because Plaintiffs have already voluntarily dismissed the Trust from this action. *See* Dkt. No. 21.

United States District Court
Northern District of California

1    answer to Plaintiff's complaint and, as such, Plaintiff's well-pleaded allegations are accepted as

2    true. *See Geddes*, 559 F.2d at 560; Fed. R. Civ. P. 8(b)(6). Employing this standard, the Court

3    concludes that Plaintiff has properly pled actions for breach of contract and fraud. However, the

4    claims for money had and received and violation of section 10146 of the California Business and

5    Professions Code are not properly pled.[4] Thus, this factor weighs in favor of granting default

6    judgment on the properly pled claims, and it weighs against granting default judgment on the

7    improperly pled claims.

a.      **Breach of contract**

9        In California, the elements of a cause of action for breach of contract are: (1) the existence

10   of the contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the

11   defendant; and (4) damages. *First Commercial Mortg. Co. v. Reece*, 89 Cal. App. 4th 731, 745

12   (2001). The essential elements of a contract are defined by statute: (a) parties capable of

13   contracting; (b) their consent; (c) lawful object; and (d) sufficient cause or consideration. Cal. Civ.

14   Code § 1550. "Contract formation . . . requires that the parties[] reach mutual assent or consent on

15   definite or complete terms . . . . Mutual assent is accomplished when a specific offer is

16   communicated to the offeree, and an acceptance is subsequently communicated to the offeror."

17   *Am. Gen. Life & Acc. Ins. Co. v. Findley*, CV 12-01753 MMM PSWX, 2013 WL 1120662, at *11

18   (C.D. Cal. Mar. 15, 2013) (quoting *Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137,

19   1155 (N.D. Cal. 2007)) (some citations omitted).

20       The Court concludes that the allegations, together with the submissions to the Court, are

21   sufficient to state a claim for a breach of contract—although not precisely as alleged in the

22   complaint. Plaintiff alleges that the contract was an agreement that Plaintiff would "cover

23   reasonable and necessary expenses of [D]efendants' due diligence inquiry, and wired the €100,000

24   Deposit to [D]efendants in consideration of [D]efendants' promise to use reasonable efforts to

25

26   ---

[4] The Court applies California law in this action because this is a diversity case and the events giving rise to the action occurred in California. *See Shanghai Automation Instrument Co., Ltd. v. Kuei*, 194 F. Supp. 2d 995, 1000 (N.D. Cal.

27   2001) ("In a diversity case, absent a choice-of-law contractual provision and under California choice of law rules, the Court presumes California law to apply unless there exists a compelling reason to displace state law with the law of a foreign jurisdiction.") (citations omitted). Further, the parties have not indicated that Netherlands law is meaningfully

28   different or that it should be applied here.

secure the necessary loan funding." Compl. ¶ 17. This allegation, however, is conclusory, and it is contradicted by the contractual documents submitted by Plaintiff to the Court. For that reason, the Court disregards it. The Court does conclude, however, that a contract exists. *See Webb v. Indigenous Global Dev. Corp.*, C-04-3174 MJJ, 2005 WL 1200203 (N.D. Cal. May 16, 2005) (citation omitted) (in ruling on motion for default judgment, disagreeing with plaintiff's interpretation of contract and instead interpreting terms according to meaning that would be ascribed by "reasonable third party").

Based on its review of the record, the Court concludes that the contract arises from the correspondence among the parties and the due diligence provisions in the Term Sheet. *See* Wallace Decl. ¶ 6; Term Sheet at 7. The contract should be interpreted as an agreement for Plaintiff to cover some of the reasonable and necessary expenses of the due diligence evaluation in connection with the prospective loan; specifically, €100,000. In return, Quartis would timely carry out the due diligence evaluation on behalf of the Trust. *See* Wallace Decl. ¶¶ 6–10; Term Sheet at 2, 7; Addendum to Term Sheet.

The Court interprets the contract this way—rather than adopting the interpretation of Plaintiff—because there is nothing in the record to indicate that Defendants were acting on behalf of Plaintiff such that Defendants would be required to use "reasonable efforts" to secure funding for the benefit of Plaintiff. What the record does support is a finding that Defendants were acting on behalf of the Trust, the adverse party in the proposed loan transaction. *See, e.g.*, Term Sheet at 1 (Plaintiff listed as "Borrower"; Trust, "represented by" Quartis, listed as "Lender"; "No Agent" listed as "Agent"). The record also supports a finding that Defendants promised to use the deposit toward reasonable costs of the due diligence evaluation. *See* Wallace Decl. ¶¶ 6–10; Term Sheet at 2 ("Quartis will undertake the complete due diligence in an expedient manner."), 7 ("Borrower will, upon acceptance of this Term Sheet, make a (reimbursable upon signing of the Facility Agreement) deposit of EURO 100,000 towards its share in the Due Diligence expenses. The total amount of the Due Diligence expenses (EURO 100,000) will be refundable on closing date."); Addendum to Term Sheet (e-mail from de Gooyer stating that due diligence evaluation was anticipated to take approximately four to six weeks).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Thus, the Court concludes that the elements of the contract are met as follows: (a) the parties are Plaintiff and Quartis, and there is no evidence that these parties were unable to consent; (b) Plaintiff consented based on its wiring of €100,000 to Quartis on June 11, 2012, *see* Wallace Decl. ¶ 10, and Quartis consented based on de Gooyer's representations about the due diligence process and timeline, *see id.* ¶ 9, as well as Quartis' acceptance of the €100,000; (c) there is no evidence that the object of this contract—a due diligence evaluation—was unlawful; and (d) €100,000 was valid consideration for Quartis' promise to timely carry out the due diligence evaluation in connection with the prospective loan.

Second, the Court concludes that Plaintiff performed its duties under the contract when it transferred €100,000 to Quartis on June 11, 2012. *See* Wallace Decl. ¶ 10. Plaintiff also regularly followed up with Quartis and offered to provide additional information. Wallace Decl. ¶ 14; Compl. ¶ 18.

Third, the Court concludes that Quartis breached the contract by failing to perform the due diligence evaluation at all, let alone within the anticipated time frame. To arrive at this conclusion, the Court accepts as true allegations that Defendants failed to request any information from Plaintiff or to accept any of Plaintiff's offers for more information. *See* Wallace Decl. ¶¶ 12–14; Compl. ¶¶ 18, 19. The Court concludes that such inaction is inconsistent with the undertaking of a due diligence evaluation. Plaintiff also alleges that Defendants did not use the €100,000 for due diligence expenses, and that they not provide any documentation of such expenses. Compl. ¶ 19. Thus, Plaintiff has properly pled a breach.[5]

Fourth, the Court concludes that Plaintiff has suffered damages in the amount of €100,000, which was transferred to Quartis on June 11, 2012. *See id.* ¶ 10. This transfer did not result in a due diligence evaluation, nor was the deposit returned to Plaintiff. *See id.*

Accordingly, Plaintiff has properly pled a claim for breach of contract against Quartis.[6]

---

[5] As discussed below, Defendants' submission contests this breach. However, for purposes of this *Eitel* factor, the Court assumes that the well-pleaded allegations of the complaint are true. *See Geddes*, 559 F.2d at 560; Fed. R. Civ. P. 8(b)(6). Here, this breach—not using the €100,000 for due diligence and facts showing a lack of due diligence—are adequately pled. The Court considers the Defendants' evidence on this point in analyzing the fifth *Eitel* factor regarding "possibility of dispute." *See* Part III.C.4., *infra*.

[6] Defendants argue that Plaintiff improperly sued de Gooyer in his individual capacity because he was acting at all

12

1

### b.     Money had and received

2       "A claim for money had and received quite simply arises in equity when 'the defendant is

3   indebted to the plaintiff in a certain sum for money had and received by the defendant for the use

4   of the plaintiff.'" *Fireman's Fund Ins. Co. v. Commerce & Indus. Ins. Co.*, C-98-1060VRW, 2000

5   WL 1721080, at *8 (N.D. Cal. Nov. 7, 2000) (quoting *Schultz v. Harney*, 27 Cal. App. 4th 1611,

6   1623 (1994); *Pike v. Zadig*, 171 Cal. 273, 275–276 (1915)) (internal quotations omitted). The

7   elements of a cause of action for money had and received are: (1) the defendant received money,

8   (2) the money received by the defendant was for the use of the plaintiff, and (3) the defendant is

9   indebted to the plaintiff. *Fireman's Fund*, 2000 WL 1721080, at *8 (quoting *Schultz*, 27 Cal. App.

10  4th at 1623).

11      "[M]oney had and received is a common count which, under California law, is not a

12  specific claim but is instead a form of pleading used to aver the existence of monetary

13  indebtedness." *Mar Partners 1, LLC v. Am. Home Mortgage Servicing, Inc.*, C 10-02906 WHA,

14  2011 WL 11501, at *4 (N.D. Cal. Jan. 4, 2011). When a common count seeks the same recovery

15  as that sought in a specific claim and is based in the same facts, "it does not survive if the

16  underlying claim does not survive." *Id.* (quoting *McBride v. Boughton*, 123 Cal. App. 4th 379, 394

17  (2004)) (some citations omitted). However, "an action for money had and received is based on the

18  existence of a quasi-contract," and "[a]n action in quasi-contract . . . does not lie when an

19  enforceable, binding agreement exists defining the rights of the parties." *Id.* (citing *Pollak v.*

20  *Staunton*, 210 Cal. 656, 665, 293 P. 26 (1930); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96

21  F.3d 1151, 1167 (9th Cir. 1996)) (citation omitted).

22      Here, Plaintiff's claim for money had and received seeks the same relief and is based in the

23  same facts as its breach of contract claim. *Compare* Compl. ¶¶ 17, 19 *with id.* ¶¶ 22–23. Because,

24  as to Quartis, this claim is duplicative of the contract claim, the Court declines to enter judgment

25  on it. Moreover, as to de Gooyer, the facts as pled, and the contract proven, do not establish that he

26

27

28  times "in his capacity as Managing Partner and Director" of Quartis. *See* Opp'n at 2. As to the contract claim, de
    Gooyer is not a party to the contract and therefore cannot be held liable for its breach as an individual.

United States District Court
Northern District of California

received any funds in his individual capacity.

Accordingly, the Court does not recommend a judgment for money had and received against Quartis or de Gooyer.

### c.    Cal. Bus. & Prof. Code § 10146

#### i.    Background law

In California, real estate brokers have numerous responsibilities that are proscribed by statute. Relevant here, section 10146 of the California Business and Professions Code provides:

> Any real estate broker who contracts for or collects an advance fee from any other person, hereinafter referred to as the "principal," shall deposit any such amount or amounts, when collected in a trust account with a bank or other recognized depository. Such funds are trust funds and not the funds of the agent. Amounts may be withdrawn therefrom for the benefit of the agent only when actually expended for the benefit of the principal or five days after the verified accounts mentioned hereinafter have been mailed to the principal.

Cal. Bus. & Prof. Code § 10146. Where advance fees are not handled properly under the requirements of this section, the principal may recover treble damages. *Id.*

A "real estate broker" is a person licensed as such under the California Business and Professions Code. *Id.* § 10015 ("'Real estate broker' refers to a person licensed as a broker under Chapter 3 of this part."). To obtain a license, a person must go through an application and examination process. *See, e.g.*, *id.* § 10150 ("Application for the real estate broker license examination shall be made in writing to the commissioner."). Persons who are not residents of California who wish to obtain a license may do so, but they are governed by additional requirements. *See id.* § 10151.5.

Licensure entitles a person to "act as a real estate broker." *Id.* § 10130 ("It is unlawful for any person to . . . assume to act as a real estate broker . . . without first obtaining a real estate license . . . ."). For example, a licensed real estate broker may "[s]olicit[] borrowers or lenders for . . . loans . . . secured directly or collaterally by liens on real property . . . ." *See id.* § 10131(d). However, even if a person is licensed as a real estate broker, he is not *acting* as a real estate broker in a given situation unless he is "acting (1) for compensation and (2) on behalf of someone else." *Horning v. Shilberg*, 130 Cal. App. 4th 197, 204 (2005) (citing *Stout v. Edmonds*, 180 Cal. App. 3d 66, 69–70 (1986)).

14

United States District Court
Northern District of California

1    In the typical transaction, "a licensed broker enters into a written agreement (brokerage

2    contract) with a principal for compensation." *Horning*, 130 Cal. App. 4th at 204 (citing *R.J. Kuhl*

3    *Corp. v. Sullivan*, 13 Cal. App. 4th 1589, 1599 (1993)). By executing this contract, the principal

4    employs the broker as her agent to perform certain services related to a prospective real estate

5    transaction. *Horning*, 130 Cal. App. 4th at 204 (citing *R.J. Kuhl*, 13 Cal. App. 4th at 1599).

6                            **ii.        Discussion**

7    Here, Plaintiff has not properly pled an action for a violation of section 10146 of the

8    California Business and Professions Code. As a preliminary matter, Defendants are not "real estate

9    brokers," despite Plaintiff's allegation that they are. *See* Compl. ¶ 27. While a defendant is

10   generally deemed to have admitted the facts alleged by the plaintiff after the Clerk has entered a

11   notice of default, a defendant is not deemed to have admitted facts that are not well-pleaded. *See*

12   *Geddes*, 559 F.2d at 560; *DIRECTV*, 503 F.3d at 854 (citation omitted). Here, Plaintiff makes no

13   allegation that Defendants are licensed as real estate brokers, or that they have met any of the

14   requirements to become real estate brokers in California, as required by law.[7] *See* Cal. Bus. &

15   Prof. Code §§ 10015, 10150, 10151.5. Thus, this allegation is conclusory and not well-pleaded.

16   More importantly, Plaintiff has failed to demonstrate that Defendants were acting as a real

17   estate broker such that a principal-agent relationship existed, and such a relationship is required to

18   prevail on this claim. *See id.* § 10146 (treble damages may be recovered by "principal"). Plaintiff

19   appears to be asserting that it was a principal and Defendants were its agent by way of an

20   allegation found in the breach of contract section of the complaint, *i.e.*, the €100,000 deposit was

21   consideration for Defendants' promise to make "reasonable efforts to secure the necessary loan

22   funding." *See* Compl. ¶ 17.

23   However, this characterization of Defendants' obligations is contradicted by the record.

24   For example, Plaintiff's general manager testifies to a principal-agent relationship, but not

25   between Quartis and Plaintiff. In his declaration supporting the Motion, he states that he

26   "understood from [his] conversations with Mr. de Gooyer and [his] review of the Term Sheet that

27

28   _____

     [7] Defendants also deny that they are real estate brokers, albeit in an untimely pleading. *See* Opp'n at 5.

United States District Court
Northern District of California

the money paid was a deposit for [Plaintiff's] share of due diligence expenses, whereby Quartis committed *on its behalf and on behalf of the* [] *Trust* to assess [Plaintiff's] suitability as borrower of the [T]rust's funds." Wallace Decl. ¶ 6. This statement indicates a principal-agent relationship between Quartis and the Trust. *Cf.* Compl. ¶ 17 ("Plaintiff agreed to cover reasonable and necessary expenses of [D]efendants' due diligence inquiry, and wired the €100,000 Deposit to [D]efendants in consideration of [D]efendants' promise *to use reasonable efforts to secure the necessary loan funding*.") (emphasis added). A promise to assess a potential borrower's suitability for a loan on behalf of a potential *lender* is not equivalent to a promise to make reasonable efforts to secure a loan on behalf of a potential *borrower*.

Plaintiff's characterization of Defendants as agent for Plaintiff is also inconsistent with Plaintiff's other allegations that Defendants "represented to [Plaintiff] at all material times that they were acting as agent for [the Trust]." *See* Compl. ¶ 8. *See also* Wallace Decl. ¶¶ 3 (Defendants "acting as agent for" Trust), 4 (Quartis "acting on behalf of" Trust), 7 (de Gooyer "writing on behalf of" Trust), 9 (de Gooyer "representing" Trust). *See also* Opp'n at 5. While brokers sometimes represent both lenders and borrowers, *see, e.g.*, *Bock v. Cal. Capital Loans, Inc.*, 216 Cal. App. 4th 264, 269 (2013), there is no brokerage contract or anything else in the record to suggest that Defendants were acting as agents for Plaintiff.[8]

Plaintiff quotes a California state appellate court case to explain the situation that section 10146 was intended to address:

> Some promoters promise to help borrowers obtain loans secured by their real estate. For this service, they charge a percentage finder's fee which they claim is due only if the loan is obtained. However, these promoters demand a deposit or retainer in advance which they say is deductible from the ultimate percentage feel when the loan is obtained. The promoters use this advance fee to cover the "costs" they incur in trying to obtain the loan. The promoters then make only token efforts to find willing lenders. Often the loans are never obtained. Nevertheless, the promoters keep the entire deposit to cover their sometimes inflated "costs."

---

[8] The Term Sheet is not a brokerage contract because it contains no terms indicating the intent of the parties for Defendants to use "reasonable efforts" to acquire a loan for Plaintiff. Rather, the Term Sheet is unambiguously a document presented by Defendants on behalf of the Trust, the adverse party, indicating terms for the prospective loan. *Compare* Term Sheet *with Nelson v. Dep't of Real Estate*, 161 Cal. App. 3d 939, 944, App. A (1984) (providing text of brokerage contract).

1    Reply at 2–3 (quoting *Nelson v. Dep't of Real Estate*, 161 Cal. App. 3d 939, 946 (1984)).

2    Plaintiff's citation does not support its argument because *Nelson* is not describing the instant

3    situation. Here, there is no evidence that Defendants acted as "promoters" who "promise[d]" to

4    help Plaintiff obtain loans. Further, there is no evidence that the deposit for the due diligence was

5    conceived of as anything analogous to a "finder's fee." To the contrary, the totality of the record

6    suggests that Plaintiff represented itself in the proposed transaction, and Defendants represented

7    the Trust. *See, e.g.*, Wallace Decl. ¶ 6. Simply put, Plaintiff was not a "principal," Defendants

8    were neither Plaintiff's agent nor did they act as a "real estate broker," and the €100,000 deposit

9    was not an "advance fee" under section 10146.

10       Accordingly, Plaintiff has not properly pled a claim for a violation of section 10146 of the

11   California Business and Professions Code against Quartis or de Gooyer.

### d.    Fraud

13       In California, the elements of a cause of action for fraud are: (1) misrepresentation; (2)

14   knowledge of the falsity of the representation; (3) intent to induce reliance; (4) justifiable reliance;

15   and (5) damages. *In re Jogert, Inc.*, 950 F.2d 1498, 1504 (9th Cir. 1991) (quoting *Stewart v.*

16   *Ragland*, 934 F.2d 1033, 1043 (9th Cir. 1991)). In federal courts, a special pleading standard

17   applies when alleging fraud. Specifically, "a party must state with particularity the circumstances

18   constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind

19   may be alleged generally." Fed. R. Civ. P. 9(b).

20       Here, Plaintiff has properly pled a claim for fraud. First, Plaintiff alleged that a

21   misrepresentation occurred when de Gooyer, on behalf of Quartis, told Plaintiff at the May 24,

22   2012 meeting in San Francisco that (1) the Trust was not concerned about the amount of equity in

23   Plaintiff's capital structure, and (2) a response to the due diligence evaluation would be given in

24   four to eight weeks following the transfer of the €100,000 deposit. *See* Compl. ¶ 32. Plaintiff has

25   alleged that these statements were false because (1) the main reason eventually given for the

26   Trust's declining to enter into the proposed loan transaction was Plaintiff's lack of equity, and (2)

27   a response to the due diligence evaluation was not given until over five months after the transfer.

28   *Id.* ¶ 33. Further, it is alleged that a due diligence evaluation was never carried out. *See id.* ¶ 38;

1  Wallace Decl. ¶¶ 12–14; Part II.C.2.a., *supra*.

2     Second, Plaintiff alleged that de Gooyer knew that the statements were false or made the

3  statements with reckless indifference to their truth. Compl. ¶¶ 33, 34. This element may be alleged

4  generally. *See* Fed. R. Civ. P. 9(b).

5     Third, Plaintiff alleged that de Gooyer made these statements with the intent to deceive and

6  induce Plaintiff into making the €100,000 deposit. Compl. ¶ 35. This element may be alleged

7  generally. *See* Fed. R. Civ. P. 9(b).

8     Fourth, Plaintiff alleged that in making its decision to make the €100,000 deposit, it relied

9  on the statement that the amount of equity was not of major concern; Plaintiff alleged that without

10  this representation, it would not have made the deposit. Compl. ¶¶ 36, 38. Plaintiff further alleged

11  that such reliance was justifiable based on de Gooyer's (1) representations that he had a long-

12  standing relationship with the Trust, (2) review of Plaintiff's documents during negotiations, and

13  (3) experience and expertise in the lending industry. *See id.* ¶ 37.

14     Fifth, Plaintiff alleged that as a result of its justifiable reliance on de Gooyer's intentional

15  misrepresentations, Plaintiff was damaged in the amount of at least €100,000, the amount of the

16  deposit. *Id.* ¶ 39.

17     Accordingly, Plaintiff has properly pled a claim for fraud against Quartis and de Gooyer.[9]

18          **3.     Amount at stake**

19     The fourth *Eitel* factor balances the amount of money at stake in the claim in relation to the

20  seriousness of the defendant's conduct. *Eitel*, 782 F.2d at 1471–72. Here, the amount of money at

21  stake—€100,000—is not disproportionate to the seriousness of Defendants' conduct, and it bears a

22  reasonable relationship to Plaintiff's documented loss. *See Webb*, 2005 WL 1200203, at *4 (citing

23  *Bd. of Trs. of the Cal. Metal Trades v. Pitchometer Propeller*, 984 F.Supp. 978, 978 (N.D. Cal.

24  1997) (in granting default judgment, noting that "[t]he amount of money at stake is reasonable,

25

26  [9] Defendants argue that Plaintiff improperly sued de Gooyer in his individual capacity because he was acting at all times "in his capacity as Managing Partner and Director" of Quartis. *See* Opp'n at 2. As to the fraud claim, de Gooyer
27  was properly sued as an individual because, under California law, an individual can be held liable for the misrepresentations that he makes, regardless of whether he was acting within the capacity of his employment at the time of the misrepresentations. *See, e.g.*, *Agosta v. Astor*, 120 Cal. App. 4th 596, 608 (2004) (reversing summary
28  judgment for individual and business defendants on fraudulent misrepresentation claim).

United States District Court
Northern District of California

properly documented and contractually justified")). Thus, this factor weighs in favor of granting default judgment.

### 4.    Possibility of dispute

The fifth *Eitel* factor weighs the possibility that material facts may be in dispute. *Eitel*, 782 F.2d at 1471–72. Here, Defendants dispute elements of the breach of contract and fraud claims. As explained below, however, the Court finds that these disputes are not sufficient to prevent entry of a default judgment, especially in light of the fact that Defendants have not sought to set aside the default judgment or to answer, nor have they taken any other steps necessary to defend this action. Quartis, the entity defendant, has not even hired an attorney to appear on its behalf, as it must. *See* Civ. L.R. 3-9(b).

### a.    Disputes regarding breach of contract

As to the breach of contract claim, Defendants argue that no contract existed. Defendants correctly argue that the Term Sheet itself contains many preliminary terms that do not themselves constitute a contract. *Se e* Opp'n at 5; Term Sheet at 1 ("This document . . . contains *indicative terms of the prospective transaction* . . . The indicative terms are neither complete nor final and are *subject to further discussion* and negotiation.") (emphasis added). However, the Term Sheet also contains terms that, together with the declarations in the record, support the finding of a contract as to due diligence costs. *See* Term Sheet at 2 ("Quartis will undertake the complete due diligence in an expedient manner."), 7 ("Borrower will, upon acceptance of this Term Sheet, make a . . . deposit of EURO 100,000 towards its share in the Due Diligence expenses."); Addendum to Term Sheet (e-mail from de Gooyer stating that due diligence evaluation was anticipated to take approximately four to six weeks); Wallace Decl. ¶¶ 6–10. This created a contract for Quartis to carry out the due diligence evaluation, in exchange for Plaintiff's payment of €100,000 of due diligence expenses.

As to the element of breach, Defendants argue that because the due diligence was fixed at a "capped 'price'"—as opposed to being an "open calculation (no cap)" situation—Plaintiff is not entitled to discover how the money was spent. *See* Opp'n at 6. However, Defendants have not adequately explained the nature of this distinction, nor have they submitted any evidence to

support their assertion that the arrangement was for a "capped" amount. Indeed, the parties agreed that the deposit would go "towards [*Plaintiff's*] *share* in the Due Diligence expenses." *See* Term Sheet at 7 (emphasis added); Compl. ¶ 19. The reference to a share of "expenses" indicates that the funds were to be reimbursement of monies expended by Quartis specifically for due diligence purposes—not merely a fixed fee for conducting any transaction-related review it might undertake.

In any event, even if the €100,000 represented a capped or fixed share of due diligence expenses, Defendants do not claim that they had *any* expenses, let alone due diligence expenses. *See* Compl. ¶ 19. Finally, even if €100,000 was the "price," it was the price for a due diligence evaluation, which Plaintiff alleges never occurred.[10] *See* Part III.C.2.a., *supra*.

Defendants claim that they spent "a lot of time and energy conducting" the due diligence. *See* Opp'n at 4. While this is a dispute, the Court concludes that it is not sufficient to forestall entry of default judgment. Defendants offer no detail or explanation of these alleged efforts. They do not explain what information was available or analyzed in exchange for €100,000. They offer no evidence of any expenses incurred in connection with the due diligence evaluation, nor do they claim that they incurred such expenses. They do not deny that they failed to request any additional information during the due diligence period. They do not provide any documentation of the due diligence evaluation, nor do they claim that they ever created such documentation for themselves or for the Trust. In short, Defendants provide no evidence of the "time" and "energy" they allegedly spent in conducting the due diligence. These omissions support the conclusion that no due diligence evaluation ever occurred. Having failed to defend, to seek counsel to defend, or to move to set aside the default, Defendants' naked averments are not sufficient to overcome the ordinary rule in default judgment matters that the well-pleaded allegation—here, that no due

---

[10] Defendants also argue that the deposit is not reimbursable or refundable under the express language of the Term Sheet, because (1) the condition for reimbursement is the "signing of the Facility Agreement," and (2) the condition for a refund is the occurrence of the "closing date," and neither of these events have occurred. *See* Opp'n at 6; Term Sheet at 7. Defendants are correct that neither of these events have occurred. However, based on the contract as interpreted by the Court, Quartis was obligated to use the €100,000 for a due diligence evaluation, regardless of whether these events occurred, and Plaintiff alleges that Quartis never carried out this evaluation. *See* Part III.C.2.a., *supra*.

United States District Court
Northern District of California

1    diligence occurred—is assumed to be true. *See Geddes*, 559 F.2d at 560; Fed. R. Civ. P. 8(b)(6).

2    Default judgment should be entered on the contract claim.

### b.    Disputes regarding fraud

4         The issue of fraud is a "question of fact involving determinations of intent and evaluations

5    of credibility properly resolved by the jury." *Jogert*, 950 F.2d at 1504 (quoting *Miller v. Fairchild*

6    *Indus.*, 876 F.2d 718, 729 (9th Cir. 1989), *amended* 885 F.2d 498 (9th Cir. 1989), *cert. denied*,

7    494 U.S. 1056 (1990)). However, Defendants only argument against this claim is that "[t]here is

8    no evidence of [fraud] as there is no misleading information and there never has been misleading

9    information or misrepresentation." Opp'n at 6. The Court rejects this assertion because it is not

10   supported by any evidence.

11        The Court notes that were Defendants to appear and seek to defend the case, it might be

12   inclined to allow Defendants their day in court. However, this is not what Defendants have done.

13   Instead, they seek to prevent entry of default judgment without taking any of the necessary steps to

14   appear and defend the action, such as retaining counsel or moving to set aside the default. If they

15   were to succeed in preventing default judgment here, Plaintiff would be left without a day in court

16   or a remedy.[11] Thus, this factor does not weigh substantially against granting default judgment.

### 5.    Possibility of excusable neglect

18        The sixth *Eitel* factor weighs whether the defendant's default may have been the product of

19   excusable neglect. *Eitel*, 782 F.2d at 1471–72. Here, Defendants were properly served, *see* Part

20   III.B., *supra*, but they did not timely respond to Plaintiff's allegations. Defendants' Opposition

21   does not include any convincing explanation for why it did not respond within the required

22   timeframes. *See id.* The Court concludes that Defendants' failure to timely or properly respond in

23   this action was not due to excusable neglect.

24        Moreover, while Defendants submitted an Opposition, they have taken no other steps to

25   properly participate in this action. Specifically, Defendants have not moved to vacate the Clerk's

---

[11] Of course, should Defendants decide to defend this case, they may move to set aside the default judgment under
Rule 60(b) of the Federal Rules of Civil Procedure.

United States District Court
Northern District of California

United States District Court
Northern District of California

entry of default, and Quartis has not had an attorney appear to represent it to oppose the Motion, as is required by law. *See* Civ. L.R. 3-9(b) ("A corporation, unincorporated association, partnership or other such entity may appear only through a member of the bar of this Court."). Thus, this factor weighs in favor of granting default judgment.

### 6.     Policy in favor of judgment on the merits

The seventh *Eitel* factor considers the policy that generally disfavors default judgments because "cases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, "because a discretionary standard is applied, 'default judgments are more often granted than denied.'" *Webb*, 2005 WL 1200203, at *5 (quoting *Pepsico v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999)).

Here, Plaintiff has properly served Defendants and has made additional efforts to make contact, including an e-mail sent on May 15, 2013. *See* Markley OSC Decl. Ex. Although Defendants are now aware of this action against them—as evidenced by their opposition to the entry of judgment—they have taken no steps to vacate the entry of default, and, as far as the Court can tell, they have not even hired an attorney so that Quartis can properly appear in this action. Thus, the policy encouraging decisions of cases on their merits does not weigh substantially against granting default judgment here. *See Elektra Entm't*, 2004 WL 783123, at *5 ("mere existence of Fed. R. Civ. P. 55(b) indicates that [this factor] is not alone dispositive" given impossibility of deciding case on merits when defendant fails to respond).

### D.     Damages

Having determined that the Motion should be granted in part, the Court now turns to the matter of damages. "Plaintiff has the burden of proving damages through testimony or written affidavit." *Bd. of Trs. of the Boilermaker Vacation Trust v. Skelly, Inc.*, No. 04-02841 CW, 2005 WL 433462, at *2 (N.D. Cal. Feb. 24, 2005). Here, Plaintiff apparently seeks treble damages under section 10146 of the California Business and Professions Code in the amount of €300,000 or, in the alternative, €100,000 in general damages. *See* Compl. at 8; Mot. at 11 (citing Wallace Decl. ¶¶ 9, 12–14).

The Court concludes that treble damages are inappropriate because Plaintiff has not

adequately pled a claim for a violation of section 10146. *See* Part III.C.2.c., *supra*. However, Plaintiff should be awarded €100,000 based on the breach of contract and fraud claims, which have been properly pled. *See* Parts III.C.2.a., III.C.2.d., *supra*. Plaintiff may not recover more than this amount in damages because the breach of contract claim and the fraud claim are two different theories that arise from the same harm, *i.e.*, the transfer of €100,000. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1005 (9th Cir. 2008) (citing *Krusi v. Bear, Stearns, & Co.*, 144 Cal. App. 3d 664 (1983)) (general rule of compensatory damages bars double recovery for same wrong); *Rogers v. Davis*, 28 Cal. App. 4th 1215 (1994) (plaintiff may request alternative remedies "but may not be awarded both to the extent such an award would constitute a double recovery").

Having determined that the injury is €100,000, the Court must determine the proper currency for expressing the judgment. For federal courts sitting in diversity, as is the case here, this question is one that depends on state law. *See* Cal. Civ. Proc. Code § 676.2(b) (Uniform Foreign-Money Claims Act "applies to foreign-money issues even if other law under the conflict-of-laws rules of this state applies to other issues in the action or distribution proceeding"). *Cf. Buckley v. Paperboy Ventures, LLC*, 277 F.R.D. 20, 21 (D.D.C. 2011) (citing *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 865 (2d Cir. 1981), *cert. denied*, 459 U.S. 976 (1982)) (where contractual obligation is denominated in foreign currency, question of when to calculate conversion to U.S. dollars is one of substance); *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 322 (6th Cir. 2011) (quoting *Competex, S.A. v. Labow*, 783 F.2d 333, 334 (2d Cir. 1986)) ("determination of the date on which to convert a foreign currency debt into dollars is a substantive question").

In order to "facilitate[] uniform judicial determination of claims expressed in the money of foreign countries," the National Conference of Commissioners on Uniform State Laws approved and recommended all states to enact the Uniform Foreign-Money Claims Act ("UFMCA") in 1989. *See* UFMCA, Prefatory Note. The UFMCA was enacted by California in 1991.[12] *See* Cal.

_____

[12] The Prefatory Note is not codified as part of the UFMCA in California.

Civ. Proc. Code § 676 *et seq.* The Prefatory Note explains the problem that the UFMCA intends to address:

> American courts historically follow one of two different rules in selecting a time during litigation for converting foreign money into United States dollars. These are called the "breach day rule"—the date the money should have been paid—and the "judgment date rule"—when judgment is entered. Many other countries use the "payment day rule"—when the judgment is paid. *See Miliangos v. George Frank (Textiles) Ltd.*, (1976) A.C. 1007 [United Kingdom]. The merits of this approach have begun to be recognized in this country. The payment day rule is endorsed by this Act.

The UFMCA's endorsement of the payment day rule is primarily effectuated by the rule that "a judgment or award on a foreign-money claim shall be stated in an amount of the money of the claim." Cal. Civ. Proc. Code § 676.7(a).

To determine the proper "money of the claim"—*i.e.*, the currency that should be used to enter judgment—the court looks to the actions of the parties. Unless the parties agree otherwise, "[t]he money in which the parties to a transaction have agreed that payment is to be made is the proper money of the claim for payment." *Id.* § 676.4(a), (b). Additionally, "[a] person may assert a claim in a specified foreign money." *Id.* § 676.6(a). Thus, a court applying California law should enter a judgment on a contract or other claim expressed in a foreign currency in that foreign currency, unless the circumstances require a different result. *See* Ronald A. Brand, Exchange Loss Damages and the Uniform Foreign-Money Claims Act: The Emperor Hasn't All His Clothes, 23 LAW & POL'Y INT'L BUS. 1, 16, 56, 56 n.235 (1992) (observing that UFMCA provides for judgments to be expressed in foreign currency and noting that at least one court had expressed judgment in foreign currency at time of publication) (citing *In re Oil Spill by the Amoco Cadiz Off the Coast of France on March 16, 1978 (Part 2 of 2)*, MDL Dkt. No. 376, 1988 U.S. Dist. LEXIS 16832, at *309–*311 (N.D. Ill. Jan. 11, 1988)). *See also* Rest. (Third) of Foreign Relations Law § 823 (1987) ("Courts in the United States ordinarily give judgment on causes of action . . . denominated in a foreign currency, in United States dollars, but they are not precluded from giving judgment in the currency in which the obligation is denominated . . . .").

As to making payment on the judgment, a defendant may pay a plaintiff in the foreign money of the claim or in the amount of U.S. dollars that is, at the time of payment, equivalent to the amount of foreign money due. *Id.* § 676.7(b) (judgment "is payable in that foreign money or,

at the option of the debtor, in the amount of United States dollars which will purchase that foreign money on the conversion date at a bank-offered spot rate.").

Here, it is uncontroverted that the parties to the contract at issue agreed that payment was to be made in Euros. *See, e.g.*, Term Sheet ("Borrower will . . . make a . . . deposit of EURO 100,000 . . . ."). Plaintiff also made its claim in Euros. *See, e.g.*, Compl. ¶ 20. Accordingly, the Court concludes that the proper money of the claim is Euros, and the judgment should be expressed in the same. *See* Cal. Civ. Proc. Code §§ 676.4(a), § 676.6(a), 676.7(a).

### E.    Attorney's Fees and Costs

Plaintiff also seeks $13,657 in attorney's fees and $788.84 in costs pursuant to section 10146 of the California Business and Professions Code. *See* Mot. at 11–13; Markley Decl. ¶ 2. As discussed above, Plaintiff has not properly pled its section 10146 claim. *See* Part III.C.2.c., *supra*. It follows that attorney's fees and costs cannot be award on this basis. Accordingly, attorney's fees and costs can only be awarded if another basis is available.

As to attorney's fees, prevailing parties in federal court are not ordinarily entitled to attorney's fees unless authorized by statute or contract. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975). Here, although Plaintiff prevails on its breach of contract theory, no contractual provision regarding attorney's fees is alleged to exist. Further, Plaintiff has not identified any statutes that would entitle it to attorney's fees based on prevailing on the common law claim of fraud. Thus, Plaintiff is not entitled to attorney's fees.

As to costs, a prevailing party may recover the Clerk's filing fee "if paid by the claimant" and fees for service of process "to the extent reasonably required and actually incurred." *Webb*, 2005 WL 1200203, at *5 (citing Civ. L.R. 54-3(a)). Here, Plaintiff has provided sufficient documentation to show that it is entitled to the cost of the filing fee and FedEx fees incurred in serving this suit. *See* Markley Decl. ¶ 2(a). Thus, Plaintiff is entitled to costs.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that Plaintiff's Motion be GRANTED as to the breach of contract claim as to Quartis, the fraud claim as to Quartis and de Gooyer, and costs. The Court recommends that Plaintiff's Motion be DENIED as to the claims for money had

25

1   and received, violation of section 10146 of the California Business and Professions Code, and

2   attorney's fees.

3       Accordingly, the Court recommends that judgment be entered as follows: Defendants shall

4   pay Plaintiff €100,000 or, at Defendants' option, the number of U.S. dollars which will purchase

5   that sum of Euros at a bank-offered spot rate at or near the close of business on the banking day

6   next before the day of payment, together with costs of $788.84; costs are to be paid in U.S.

7   dollars.[13] *See id.* § 676.7(f).

8       Any objections to this Report and Recommendation shall be filed within fourteen days of

9   the date of this Report and Recommendation.

10  Dated: January 21, 2014

11

12      JOSEPH C. SPERO
        United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

---

[13] This language is consistent with the language recommended in the UFMCA: "IT IS ADJUDGED AND ORDERED, that Defendant (insert name) pay to Plaintiff (insert name) the sum of (insert amount in the foreign money) plus interest on that sum at the rate of (insert rate []) percent a year or, at the option of the judgment debtor, the number of United States dollars which will purchase the (insert name of foreign money) with interest due, at a bank-offered spot rate at or near the close of business on the banking day next before the day of payment, together with assessed costs of (insert amount) United States dollars." Cal. Civ. Proc. Code § 676.7(f).